**UPTOWN DRUG COMPANY, INC., Plaintiff,**

v.

**CVS CAREMARK CORPORATION, et al., Defendants.**

**No. 12–cv–06559–JST.**

United States District Court, N.D. California.

July 22, 2013.

Bonny E. Sweeney, David J. Harris, Jr., Robbins Geller Rudman & Dowd LLP, San Diego, CA, Samuel H. Rudman, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, David A. Balto, Law Offices of David A. Balto, Washington, DC, for Plaintiff.

Michael A. Naranjo, Page R. Barnes, Foley & Lardner LLP, San Francisco, CA, Michael David Leffel, Foley & Lardner LLP, Madison, WI, Robert H. Griffith, Foley & Lardner LLP, Chicago, IL, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION AND TO STAY ACTION AND GRANTING MOTIONS TO SEAL**

Re: ECF No. 17, 18, 42

JON S. TIGAR, District Judge.

In this putative class action for violations of the California Uniform Trade Secrets Act and related claims, Defendants move to compel arbitration and to stay the action pending arbitration. Plaintiff Up-

town Drug Company, Inc. ("Uptown") opposes the motion. For the reasons set forth below, the motion to compel arbitration is GRANTED IN PART and DENIED IN PART and the motion to stay the action pending arbitration is GRANTED.

## I. BACKGROUND

### A. The Parties and Claims

Uptown provides pharmacy services to individuals who participate in certain group health plans. Compl. ¶¶ 1–2, 14. These group health plans provide to customers pharmacy benefits that are sponsored, administered, or insured by pharmacy benefit managers ("PBMs"). *Id.* ¶ 14.

CVS Caremark is a retail pharmacy chain that competes directly with Uptown.[1] *Id.* ¶ 1. CVS Caremark merged with Caremark Rx, the second largest PBM in the country, in 2007. *Id.* As a PBM, Caremark Rx fills prescriptions, processes prescription drug claims, negotiates discounts with manufacturers, and performs other functions for PBM plan members. *Id.*

Uptown has a business relationship with Caremark Rx's PBM branch because many of Uptown's customers receive drug benefits under PBM prescription plans. *Id.* This relationship is governed by a provider agreement, which allows Uptown to fill prescriptions for participants in Caremark's PBM plans at discounted prices and requires Uptown to disclose certain customer information to Caremark Rx whenever it submits claims for reimbursement.

Uptown has disclosed customer information to Caremark's PBM operations "in confidence and solely for the purpose of adjudicating [ ] prescription claims." Caremark Rx allegedly has disclosed this information without authorization to Caremark's retail pharmacies, which compete directly with Uptown, for the purpose of marketing products and services to Uptown's customers. *Id.* ¶¶ 4, 47, 81. These unauthorized disclosures, which allegedly contravene Caremark's own internal policies and the Health Insurance Portability and Accountability Act, have resulted in increased revenues for Caremark's retail pharmacies at the expense of Uptown and other non-CVS pharmacies. *Id.* ¶¶ 3–6, 63.

Uptown brings this action on its own behalf and on behalf of other similarly situated pharmacies in California against Defendants CVS Caremark, CVS Pharmacy, Caremark Rx, and Caremark, L.L.C. for (1) violations of California's Uniform Trade Secrets Act ("UTSA"); (2) violations of the unlawful prong of California's Unfair Competition Law ("UCL"), California Business and Professions Code section 17200; (3) violations of the unfair prong of the UCL; and (4) interference with prospective economic advantage ("IPEA").[2] The gravamen of the complaint is that Defendants' unauthorized disclosure of non-CVS pharmacies' customer information constitutes the misappropriation of trade secrets.

### B. Provider Agreements and Manuals

In 1995, Uptown entered into an agreement with PCS Health Systems ("the PCS Provider Agreement"), which is a PBM

---

1. Defendant CVS Caremark is the corporate parent of Defendant CVS Pharmacy, Inc., which is the sole member of Defendant Caremark Rx, L.L.C. Mot. at 4, n. 4. Caremark Rx, L.L.C., in turn, is the sole member of Caremark, L.L.C. and the sole member of CaremarkPCS, L.L.C. *Id.*

2. The putative class consists of "all retail pharmacies in California that provided confidential patient information to CVS Caremark after March 22, 2007 for purposes of utilizing CVS Caremark's PBM services." Compl. ¶ 69.

that ultimately became Caremark PCS Health in 2008 as a result of various acquisitions and mergers.[3] Pagnillo Decl. ¶ 14 & Ex. A, ECF No. 18;[4] Request for Judicial Notice ("RJN"), Ex. A, B., ECF No. 19.[5] The agreement allowed Uptown to be included in PCS Health's PBM networks. *See generally* Pagnillo Decl., Ex. A.

PCS Health retained the right to amend the PCS Provider Agreement at any time as long as it gave notice to the pharmacy providers, including Uptown, no less than 30 days before enacting any amendment. Pagnillo Decl., Ex. A ¶ 1.3. The PCS Provider Agreement contained an arbitration clause and incorporated by reference a PCS Manual. *See* Pagnillo Decl., Ex. A ¶ 9.5 (arbitration clause); *id.* ¶¶ 1.3, 9.7 (provider manual).

The PCS Provider Agreement and the incorporated PCS Manual have been amended several times as a result of multiple mergers and acquisitions.[6] Each time, PCS Health's successors provided advance notice to provider pharmacies of the amendments.[7]

The current version of the PCS Provider Agreement and the incorporated PCS Manual is the Caremark Provider Agreement and the 2011 Caremark Provider Manual ("the 2011 Provider Manual"). The 2011 Provider Manual sets forth the rights and obligations of Uptown and Defendants with respect to Uptown's participation in the networks maintained by Caremark and its affiliates, as well as the terms and conditions for filling prescriptions, submitting claims for reimbursement, and receiving, sorting, and transmitting customer information. Pagnillo Decl., Ex. D at 13–20. Additionally, the 2011 Provider Manual includes provisions that clearly identify Caremark as the party that owns any customer data compiled, utilized, or transmitted in accordance with the Caremark Provider Agreement. *See, e.g.,* Pagnillo Decl., Ex. D at 48 ("Provider agrees that the information contained in the claims systems that was obtained by and through the administration and adjudication of a claim by Provider is the property of Caremark, and Provider agrees not

---

3. PCS Health Systems was owned by Rite Aid Corporation until it merged with Advance PCS, L.P. in 2001. RJN, Ex. A, B., ECF No. 19. Advance PCS, L.P. ultimately became Caremark PCS Health, L.L.C. in 2008. *Id.*

4. Defendants' motions to seal Exhibits A through F of the Pagnillo Declaration, ECF Nos. 17, 42, are GRANTED, as Defendants have established that the confidential business information contained in such documents is sealable.

5. The Court takes judicial notice of the documents that Defendants filed with California's Secretary of State and Delaware's Secretary of State for the purpose of effectuating the conversion of Caremark Inc. into a limited liability company and the change of Advance PCS's name to Caremark PCS, ECF No. 19, because such documents can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned and no party questions their authenticity. *See* Fed.R.Evid. 201.

6. The PCS Provider Agreement was amended after PCS Health merged with Advance PCS, L.P. in 2000; the agreement became known as the "AdvancePCS Provider Agreement." Pagnillo Decl. ¶¶ 16–17 & Ex. B. The Advance PCS Provider Agreement was amended in 2004 when Caremark Rx acquired AdvancePCS; the agreement became known as the "Caremark Provider Agreement." *Id.* ¶ 20. Caremark has amended the Caremark Provider Agreement several times since 2004. *Id.* ¶¶ 21–24 & Ex. D.

7. *See* Pagnillo Decl. ¶ 17 (notice of AdvancePCS Provider Agreement); *id.* ¶¶ 18–19 & Ex. C (notice of the Caremark Provider Agreement); *id.* ¶ 21 (notice of 2004 Caremark Provider Manual); *id.* ¶ 22 (notice of 2007 Caremark Provider Manual and notice that Caremark, Inc. and CaremarkPCS became limited liability companies); *id.* ¶ 23 (notice of 2009 Caremark Provider Manual); *id.* ¶ 24 & Ex. D (notice of 2011 Caremark Provider Manual).

to claim any right, title, or interest in said information. Caremark has the right to use, reproduce, and adapt any information or data obtained from Provider in any manner deemed appropriate, even if such use is outside the scope of the Provider Agreement, provided such use is in accordance with applicable Law."); *see also id.* at 13–20, 38 (providing for the collection, maintenance, transmission, and use of data related to filling prescriptions).

## C. The Arbitration Clause

The 2011 Provider Manual contains an arbitration clause under a section entitled "Miscellaneous." Pagnillo Decl., Ex. D at 50. It provides that:

> **Any and all disputes in connection with or arising out of the Provider Agreement by the parties will be exclusively settled by arbitration** before a single arbitrator in accordance with the Rules of the American Arbitration Association. The arbitrator must follow the rule of Law, and may only award remedies provided for in the Provider Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona, and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing.... **Arbitration shall be the exclusive and final remedy for any dispute between the parties in connection with or arising out of the Provider Agreement;** provided, however, that **nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court of law**.... The terms of this Arbitration section apply notwithstanding any other provision in the Provider Agreement.
>
> *Id.* (emphasis added).

## D. Motion to Compel Arbitration

Defendants argue that each of the claims in the complaint must be resolved through arbitration in accordance with the arbitration clause contained in the 2011 Provider Manual, because such claims arise out of the Caremark Provider Agreement and the 2011 Provider Manual. ECF No. 18.

Uptown opposes the motion, arguing that (1) the arbitration clause is substantively and procedurally unconscionable and therefore is unenforceable; (2) none of the Defendants signed the original PCS Provider Agreement and therefore they cannot enforce it; (3) the arbitration clause was not incorporated into any Provider Agreement; and (4) the Court has jurisdiction to hear any claims for injunctive relief prior to deciding whether to compel arbitration. ECF No. 44.

## E. Jurisdiction

The Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2).

## II. LEGAL STANDARD

"With limited exceptions, the Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir.2013). The FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). It requires the enforcement of an arbitration clause in a contract unless grounds exist "at law or in equity for the revocation of any contract." 9 U.S.C. § 2. An arbitration clause may be revoked by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent–A–Cen-*

*ter, West, Inc. v. Jackson,* 561 U.S. 63, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010).

A party bound by an arbitration clause may bring a petition in district court to compel arbitration. 9 U.S.C. § 4. When a party files such a petition, "the district court's role is limited to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue. If the answer is yes to both questions, the court must enforce the agreement." *Lifescan, Inc. v. Premier Diabetic Services, Inc.,* 363 F.3d 1010, 1012 (9th Cir.2004). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.–Alabama v. Randolph,* 531 U.S. 79, 91, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Where the claims alleged in a complaint are subject to arbitration, the Court may stay the action pending arbitration. 9 U.S.C. § 3.

## III. DISCUSSION

### A. The Arbitration Clause is Valid and Enforceable Under the FAA

#### 1. The Court Must Decide Whether Arbitration Clause is Valid

When a party to a contract challenges the validity of an arbitration clause, as opposed to the validity of the contract containing the arbitration clause as a whole, the court must determine whether the arbitration clause is valid and enforceable. *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1263–64 (9th Cir.2006) (holding that when a party challenges "not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA").

Here, Uptown challenges the validity of the arbitration clause in the 2011 Provider Manual on the ground that the clause is unconscionable. Because Uptown's unconscionability challenge is to the arbitration clause and not to the 2011 Provider Manual as a whole, the Court, and not the arbitrator, must determine whether the arbitration clause is valid.

#### 2. The Validity of the Arbitration Clause Is Governed by California Law

When deciding whether an arbitration agreement is valid, courts "apply general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Mundi v. Union Security Life Insur. Co.,* 555 F.3d 1042, 1043 (9th Cir.2009) (citations and internal quotation marks omitted). A district court exercising diversity jurisdiction must apply the law of the state in which it sits when determining the validity of an arbitration clause. *See Nagrampa,* 469 F.3d at 1280 (holding that district courts in California exercising diversity jurisdiction over a contract dispute "must apply California law to determine whether the arbitration provision in the [ ]contract is unconscionable"). Where an arbitration agreement contains a choice-of-law clause, a district court must determine whether to enforce the law chosen by the parties based on the conflict-of-laws rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).

Here, Defendants contend that the PCS Provider Agreement contains a choice-of-law provision requiring that the agreement be construed and enforced in accordance with Arizona law, and they argue that the application of Arizona law is justified because the parties' obligations under the Agreement are substantially performed in Arizona. *See* Supp. Pagnillo Decl. ¶ 6.

Uptown opposes the application of Arizona law to the question of whether the arbitration agreement is valid and argues that California law should apply instead because neither the parties nor the transactions at issue in the complaint have a substantial relationship to Arizona.

The Court concludes that it need not reach the question of whether the PCS Provider Agreement's choice-of-law provision should be enforced because Defendants have not shown that the Caremark Provider Agreement, which is the current iteration of the PCS Provider Agreement, contains a choice-of-law provision. The choice-of-law provision cited by Defendants is contained in the 1995 PCS Provider Agreement, which has been amended multiple times since 1995.[8] Without any evidence showing that the choice-of-law provision in the 1995 PCS Provider Agreement continues to govern the parties' contractual relationship, the Court cannot enforce that provision.[9]

Accordingly, because the Court has diversity jurisdiction over this action, California law governs the determination of whether the arbitration provision in the 2011 Provider Manual is unconscionable.

### 3. Uptown Has Not Shown that the Arbitration Clause is Unconscionable

██ Under California law, "unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (Cal.2000) (citation and internal quotation marks omitted). Procedural and substantive unconscionability "must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree." *Id.* (internal citation omitted). "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

Here, Uptown provides no evidence to establish that the arbitration clause is procedurally unconscionable. Accordingly, Uptown's unconscionability challenge to the validity of the arbitration clause fails.

#### a. Procedural Unconscionability

██ The "[p]rocedural unconscionability analysis focuses on oppression or surprise." *Nagrampa,* 469 F.3d at 1280 (citation and internal quotation marks omitted). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," while "[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Id.* (citation omitted).

██ Here, Uptown argues that the arbitration clause is procedurally unconscionable on the grounds that (1) "every retail pharmacy must do business with CVS Caremark's PBM business," as "CVS Caremark is the largest provider of prescriptions and related health services in the nation"; (2) Caremark presented the

---

**8.** The choice-of-law provision requires that the Agreement "be construed, governed and enforced in accordance with the laws of the State of Arizona" unless applicable law mandates otherwise. *See* Pagnillo Dec., Ex. A at § 9.4.

**9.** As Plaintiff points out, the test for unconscionability is the same under either California or Arizona law, so it does not appear that the choice-of-law provision would affect the outcome in any event.

arbitration clause to Uptown on a take-it-or-leave-it basis without providing Uptown any opportunity to negotiate it; (3) Caremark reserved the right to unilaterally modify the terms of the arbitration clause; (4) the arbitration clause is in the "middle of a 217–page document" and does not contain an opt-out clause or an explanation of the rights that Uptown gave up in light of the arbitration clause. Mot. at 9–10.

The Court concludes that Uptown has failed to show that the arbitration clause is procedurally unconscionable.

First, Uptown's unconscionability arguments focus on Caremark and on the amendments that Caremark and its affiliates have made to the Caremark Provider Agreement and the Caremark Provider Manual. Uptown ignores, however, that an arbitration clause has been a part of Uptown's contractual relationship with PCS Health and its successors continually for the last eighteen years. Indeed, the 1995 PCS Provider Agreement, which was drafted and implemented by a non-Caremark entity, contained provisions that are nearly identical to the ones Uptown now finds objectionable in the 2011 Provider Manual, namely an arbitration provision without an express opt-out clause and provisions that allow PCS Health to unilaterally amend the Agreement at any time as long as it gives advance notice to the provider pharmacies.[10] Pagnillo Decl., Ex. A ¶¶ 1.3, 9.5. Uptown provides no evidence to establish either the existence of a power imbalance between Uptown and PCS Health or that Uptown lacked any meaningful choice when it decided to enter into a contract containing an arbitration clause with PCS Health in 1995.

Second, Uptown's unconscionability challenges to the Caremark Provider Agreement and the 2011 Provider Manual are conclusory and unsupported by the evidence before the Court. Uptown complains of Caremark's superior bargaining power but it provides no evidence to show that the realities of the industry in which it operates compel it to do business with Caremark on Caremark's terms. The only fact that Uptown has offered on this issue is that Caremark is the largest PBM in the country. There is no evidence regarding Caremark's market share, the existence and market share of competitors, the existence of alternative retail partners, or the other mechanisms, if any, by which patients choose a pharmacy. Without such information, the Court cannot conclude, solely on the basis of Caremark's being the largest PBM, that there was no real negotiation or that Uptown had no meaningful choice. At best, Caremark's leadership position may explain why Uptown *wanted* to do business with Caremark, but it does not compel the conclusion that Uptown *had* to do business with Caremark.

Uptown also argues that the arbitration clause in the 2011 Provider Manual is unconscionable because Caremark presented it to Uptown on a take-it-or-leave it basis and because Caremark reserved the right to unilaterally modify the clause. This argument is unpersuasive, given that Caremark complied with its contractual obligation to give advance notice to Uptown each time it amended the Caremark Provider Agreement. *See* Pagnillo Decl. ¶¶ 16–24; Supp. Pagnillo Decl. ¶¶ 4–5. The purpose of the advance-notice requirement presumably was to give provider pharmacies an opportunity to exit their contractual relationship with Caremark if they objected to the proposed amendments. Also, Uptown has submitted no evidence to show that it could not have negotiated to alter the terms of the pro-

10. Both of these provisions were written in plain language and in conspicuous typeface and can be readily found in the 12–page PCS Provider Agreement.

posed amendments, or that it could not have terminated its business relationship with Caremark and established a relationship with an alternative partner in the event that Caremark refused to negotiate.

■ Uptown further contends that the arbitration clause in the 2011 Provider Manual is unconscionable because it "lurks unremarkably in the middle of a 217–page document" and does not contain an express opt-out clause or an explanation of the rights that Uptown would give up in light of the arbitration clause. This argument is unconvincing for two reasons. First, upon review of the 2011 Provider Manual, the Court cannot conclude that the arbitration clause is "unremarkable" or hidden or that it does not contain an explanation of the implications of its existence. While Uptown is correct in noting that the 2011 Provider Manual is more than 200 pages, the Manual contains a very thorough table of contents that very clearly states that the arbitration clause at issue is located on pages 49 and 50 of the Manual. The arbitration clause itself in written in reasonably sized text and in plain language and explains that "[a]rbitration shall be the exclusive and final remedy for any dispute between the parties in connection with or arising out of the Provider Agreement; provided, however, that nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court of law." Pagnillo Decl., Ex. D at 50. Second, while Uptown is correct that the arbitration clause does not contain an express "opt-out" clause, Uptown has not shown that the advance-notice requirement for proposed amendments discussed above is not the functional equivalent of an opt-out clause.

Finally, the authorities that Uptown cites in support of its procedural unconscionability arguments are not on point, because they deal with situations involving unsophisticated individuals who were presented with take-it-or-leave-it contracts by parties who had overwhelming bargaining power. *See, e.g., Bowlin v. Goodwill Indus. of Greater E. Bay, Inc.,* 12–cv–01593 NC, 2013 WL 269131, at *4 (N.D.Cal. Jan. 24, 2013) (finding procedural unconscionability because individual employee was presented with a form contract and was denied the opportunity to negotiate the contract's terms by his employer); *Sparks v. Vista Del Mar Child & Family Servs.,* 207 Cal.App.4th 1511, 1523, 145 Cal. Rptr.3d 318 (2012) (finding procedural unconscionability because individual employee was presented with an arbitration provision buried in an employee handbook); *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1284 (9th Cir.2006) (finding minimal procedural unconscionability because franchisor presented a contract to an unsophisticated first-time franchisee on a take-it-or-leave-it basis and franchisor had "overwhelming" bargaining power). The agreement here involves two business entities, and Uptown provides no evidence to show that it was in any way unsophisticated or that PCS Health or its successors, including Caremark, had overwhelming relative bargaining power.

### b. Substantive Unconscionability

Because Uptown has not shown that the arbitration clause is procedurally unconscionable to any degree, the court need not inquire into whether the agreement is substantively unconscionable, as both procedural and substantive unconscionability must be established for an unconscionability challenge to succeed. *See Kilgore v. KeyBank, Nat. Ass'n,* 673 F.3d 947, 964 (9th Cir.2012) ("Because we hold that the arbitration clause in the parties' contract is not procedurally unconscionable, we need not address whether the terms of that clause are substantively unconscionable.").

### 4. The Arbitration Clause Can Be Enforced Against Uptown

#### a. Caremark, L.L.C. Is the Successor to PCS Health

■ Uptown argues that the arbitration clause cannot be enforced against it because Defendants have not shown that Caremark, L.L.C. is a successor to PCS Health with respect to the 1995 PCS Provider Agreement.

The evidence submitted by Defendants shows (1) that PCS Health was owned by Rite Aid Corporation until it merged with Advance PCS, L.P. in 2001, and that Advance PCS, L.P. ultimately became Caremark PCS Health, L.L.C. in 2008, RJN, Ex. A, B., ECF No. 19; (2) that Caremark, Inc. and Caremark PCS, Inc. amended the AdvancePCS Provider Agreement, which was the immediate successor to the 1995 PCS Provider Agreement, after Caremark Rx acquired Advance PCS in 2004, Pagnillo Decl. ¶¶ 18, 22 & Ex. C; and (3) that Caremark gave notice to Uptown that the resulting Caremark Provider Agreement was with Caremark Inc. and Caremark PCS, Inc., which ultimately became Caremark, L.L.C. and Caremark PCS, L.L.C., respectively. Pagnillo Decl. ¶¶ 14–24 & Ex. C.

Based on this evidence, the Court concludes that both Caremark, L.L.C. and Caremark PCS, L.L.C. are successors to PCS Health with respect to the 1995 PCS Provider Agreement and that these entities can enforce the Agreement.

#### b. The Provider Manuals Were Incorporated into the Provider Agreements

Uptown argues that the arbitration clause at issue cannot be enforced against it because "there is no provision that clearly purports to incorporate any 'Caremark Provider Manual' into the Provider Agreement, and Defendants have not submitted any evidence that an original 'PCS Manual' existed in the first place that could have subsequently been amended." Opp'n at 13.

■ "Under California law, for one document to incorporate another document by reference, [t]he reference to the incorporated document must be clear and unequivocal and the terms of the incorporated document must be known or easily available to the contracting parties." *Cariaga v. Local No. 1184 Laborers Int'l Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir.1998) (citation and internal quotation marks omitted).

Here, Defendants have submitted evidence showing that the PCS Manual was clearly and unequivocally incorporated into the original 1995 PCS Provider Agreement. *See* Pagnillo Decl., Ex. A ¶ 9.7 (providing that the "Entire Agreement" consists of "[t]his Agreement, its schedules, and *the PCS Manual . . .*") (emphasis added). Defendants also have shown that the Caremark Provider Manual, which is an amended version of the PCS Manual, also was clearly and unequivocally incorporated into the Caremark Provider Agreement and that Caremark sent copies of the Caremark Provider Manual to Uptown. *See* Supp. Pagnillo Decl., Ex. F (letter clarifying that Caremark Provider Agreement "includes the Caremark provider Manual"); *see also* Pagnillo Decl. ¶¶ 21–24 (declaring that Caremark sent to pharmacy providers various versions of the Caremark Provider Manual).

#### c. Nonparties Can Compel Arbitration under California Law

Uptown argues that Defendants CVS Caremark, CVS Pharmacy, and Caremark Rx cannot enforce the arbitration clause at issue with respect to the claims that Uptown has asserted against them because they are not signatories to any of the Provider Agreements. Defendants counter that, under the doctrine of equitable estoppel, each of them can compel the arbitration of Uptown's claims even though

Caremark, L.L.C. is the only Defendant who is a party to the 2011 Provider Manual.

 "Generally, the contractual right to compel arbitration may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration." *Kramer v. Toyota Motor Corp.,* 705 F.3d 1122, 1126 (9th Cir. 2013) (citation and internal quotation marks omitted). Yet, "[t]he United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Id.* at 1128 (citation omitted).

 Under California law, "where a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *Id.* at 1128–29 (internal citations and quotation marks omitted).[11] The

underlying purpose of the doctrine of equitable estoppel is to "preclude[ ] a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi,* 555 F.3d at 1045 (citation and internal quotation marks omitted).

Here, the application of equitable estoppel is justified with respect to three out of the four claims asserted in the complaint.

Uptown's claims for (1) violations of the UTSA, (2) violations of the unlawful prong of the UCL, and (3) IPEA, are founded and intertwined with the Caremark Provider Agreement. Each of these claims is predicated on Defendants' alleged misappropriation of the customer information that Uptown disclosed to Caremark by virtue of Uptown's inclusion in Caremark's PBM networks.[12] Uptown's inclusion in Caremark's PBM networks, in turn, is governed by the Caremark Provider Agreement. The terms of the Caremark Provider Agreement expressly addresses the use, dissemination, and ownership of the customer information that Defendants allegedly misappropriated. *See, e.g.,* Pagnillo Decl., Ex. D at 48 ("Provider agrees that the information contained in the claims systems that was obtained by and through the administration and adjudication of a claim by Provider is the property of Caremark, and Provider agrees not to claim any right, title, or interest in said information. Caremark has the right to use, re-

---

11. The Court applies California law to the equitable estoppel issue because this action invokes the Court's diversity jurisdiction, and, as discussed above, Defendants have not shown that the operative Caremark Provider Agreement contains a choice-of-law provision. Moreover, Plaintiff and Defendants all agree that the Court should apply the test set forth in *Kramer v. Toyota Motor Corp.,* 705 F.3d 1122 (9th Cir.2013).

12. *See, e.g.,* Compl. ¶ 81 (UTSA claim) ("Such misappropriation of plaintiff's and Class members' trade secrets and confidential pat-

ent/customer information violates the UTSA."); *id.* 85 (Unlawful UCL claim) ("Defendants have violated § 17200's prohibition against engaging in 'unlawful' acts or practices by, as alleged above, misappropriating plaintiff's and Class members' trade secrets … in violation of UTSA"); *id.* ¶¶ 104–105 (IPEA claim) ("In misappropriating plaintiff's and Class members' proprietary information and data for its financial gain … Defendants … disrupted the existing or prospective relationship between plaintiff and Class members and defendants' beneficiaries.").

produce, and adapt any information or data obtained from Provider in any manner deemed appropriate, even if such use is outside the scope of the Provider Agreement, provided such use is in accordance with applicable Law."); *see also id.* at 13–20, 38 (providing for the collection, maintenance, transmission, and use of data related to filling prescriptions and submitting claims for reimbursement).

 To prevail on a claim for misappropriation of trade secrets, a plaintiff must prove: "(1) the existence of a trade secret, and (2) misappropriation of the trade secret." *See AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F.Supp.2d 941, 950 (N.D.Cal.2003) (citing Cal. Civ.Code § 3426.1(b)). Misappropriation is defined in part as the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who ... [a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *See* Cal. Civ.Code § 3426.1(b)(2). Here, to prevail on each of the misappropriation-based claims, Uptown will have to prove that Caremark disclosed the customer data at issue without authorization despite knowing that it had a duty to maintain the data's secrecy or to limit its use. The question of whether Caremark was to any extent barred from disclosing or using Uptown's customer data must be answered by looking at the terms of the Caremark Provider Agreement, because that contract explicitly governs the collection and use of such information and because it provides the underlying basis for Uptown's disclosure of such information. Uptown must establish that Caremark's use of that information exceeded the scope of use permitted under the Provider Agreement. As Uptown's misappropriation claims are "intimately founded and intertwined with the underlying contract obligations," and because Uptown alleges that Defendants acted in concert in misappropriating Uptown's customer data, the application of equitable estoppel is justified with respect to these claims.[13] *Kramer*, 705 F.3d at 1129 (citation omitted). Accordingly, non-signatory Defendants may compel the arbitration of these claims.

Uptown does not dispute that the Caremark Provider Agreement governs its inclusion in Caremark's PBM networks. Instead, Uptown argues that all of its claims are independent of the Caremark Provider Agreement because it "never mentions the Provider Manual or any of its provisions in the Complaint, and never mentions the Provider Agreement other than to disavow the notion that Plaintiff's claims arise thereunder." Opp'n at 19. That Uptown never refers to the Caremark Provider Agreement by name in the complaint is not dispositive of the question of whether Uptown's claims are intertwined with the Agreement, because the complaint is replete with implicit references to that contract.[14] Moreover, the dependent relation-

---

**13.** Uptown alleges that Defendants engaged in substantially concerted misconduct when they misappropriated the customer data at issue for their own financial gain. *See, e.g.,* Compl. ¶ 82 (UTSA claim) ("Defendants' conduct discussed above proximately caused and is causing damage"); *id.* ¶ 86 (Unlawful UCL claim) ("Defendants have violated § 17200"); *id.* ¶ 99 (IPEA claim) ("Defendants interfered with an actual prospective economic relationship").

**14.** *See, e.g.,* Compl. ¶ 14 ("Uptown Drug is a qualified provider under defendants' various pharmacy benefit management programs."); *id.* ¶ 27 ("In order to adjudicate the patient's claim, CVS Caremark requires that the retail pharmacy supply several pieces of information to CVS Caremark ... for claims processing"); id. ¶ 43 ("Plaintiff's and Class members' pharmacy patient lists, including the demographic information and prescription history of each patient, are proprietary and

ship between Uptown's misappropriation claims and the Provider Agreement is evident from the simple fact that, absent the Provider Agreement, Uptown would have no claims against Defendants with respect to the customer information at issue, because in that scenario, Uptown would not have been required to disclose such information to Defendants.

■ In contrast, Uptown's claim for violations of the unfair prong of the UCL is not founded or intimately intertwined with the Caremark Provider Agreement. This claim is premised on Defendants' exclusion of Uptown and the putative class members from certain Maintenance Choice networks that Caremark's PBM branch established with third-party insurers and plan sponsors. Compl. ¶¶ 53–65. As a result of this alleged exclusion, Uptown and the putative class members have allegedly suffered monetary losses because they cannot provide pharmacy services to the members of such networks. *Id.* Defendants contend that this claim arises out of the Caremark Provider Agreement because a provision in the Agreement states that Caremark "may make available to Provider the opportunity to participate in Caremark or Plan Sponsor Networks." *See* Pagnillo Decl., Ex. D at 21; Mot. at 12. Because this provision does not create any rights or duties with respect to the Maintenance Choice networks, the Court cannot conclude that Uptown's claim has any significant foundation in that provision or in the Agreement as a whole. Accordingly,

nonsignatory Defendants may not compel the arbitration of this claim.

**B. The Arbitration Clause Encompasses Uptown's Misappropriation–Based Claims**

■ "Under established law, [t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." [15] *In re Van Dusen,* 654 F.3d 838, 843 (9th Cir.2011) (citations and internal quotation marks omitted). To fall within the scope of an arbitration clause, a claim need only "touch matters covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir.1999) (citation omitted).

Here, the arbitration clause provides that "[a]ny and all disputes in connection with or arising out of the Provider Agreement by the parties will be exclusively settled by arbitration ..." Pagnillo Decl., Ex. D at 50.

As discussed above, Uptown's misappropriation-based claims are founded on the Caremark Provider Agreement. As such, they arise out of the Provider Agreement and thus fall within the scope of the arbitration clause. For this reason, and because each of the Defendants may move to compel the arbitration of these claims re-

confidential. Plaintiff and Class Members only disclose such information to CVS Caremark's PBM operation for the purpose of claims adjudication, and the Pharmacy Services segment is required to keep such information confidential, and to use it only for the authorized purpose of pharmacy benefits management.").

15. Defendants argue that the parties delegated the question of arbitrability to the arbi-

trator by expressly incorporating the rules of the American Arbitration Association in the arbitration clause. Mot. at 10. Because the Ninth Circuit has not addressed in a published opinion the question of whether such incorporation is sufficient to submit the question of arbitrability to the arbitrator, and because there is disagreement among the lower courts on this issue, the Court concludes that the question of arbitrability in this case is for judicial determination.

gardless of whether they signed the Agreement, Defendants' motion to compel the arbitration of these claims is GRANTED.

In contrast, Uptown's claim under the unfair prong of the UCL does not touch matters covered by the Provider Agreement and therefore falls outside of the arbitration clause. For this reason, and because nonsignatory Defendants cannot compel the arbitration of this claim, Defendants' motion to compel arbitration of this claim is DENIED.

## C. The Action is Stayed Pending Arbitration

The FAA provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3.

Defendants move to stay the litigation of any claims that the Court finds unsuitable for arbitration until the arbitration of all other claims is completed.

Uptown opposes Defendants' request and urges the Court to "maintain its jurisdiction over this case in order to consider requests for injunctive relief, even over those claims which the Court may find are suitable for arbitration." Opp'n at 24.

Having concluded that all misappropriation-based claims are subject to arbitra-

tion, the Court finds that a stay of the remaining claim for violations of the unfair prong of the UCL is warranted. *See Kilgore*, 673 F.3d at 955 ("The federal case must be stayed while the parties proceed to arbitration.").

The Court will not consider Uptown's requests for injunctive relief at this time, as such requests are wholly derivative of the claims asserted in the complaint and thus are subject to the same arbitration analysis and conclusions as the claims from which they stem.[16] *See* Compl. ¶¶ 109–115 (requesting permanent injunction (1) requiring Defendants to admit Uptown and the putative class members into the Maintenance Choice networks; and (2) barring Defendants from disclosing or otherwise using Uptown's customer information except for the purpose of adjudicating Uptown's benefit claims). Consequently, all requests for injunctive relief that derive from Uptown's misappropriation-based claims must be resolved through arbitration, and the request for injunctive relief in connection with the remaining UCL claim is stayed pending arbitration.

## IV. CONCLUSION

Defendants' motion to compel arbitration is granted in part and denied in part. The motion is granted with respect to Uptown's claims for (1) violations of the UTSA, (2) violations of the unlawful prong of the UCL, and (3) interference with prospective economic advantage. The motion is denied with respect to Uptown's claim for violations of the unfair prong of the

---

16. The arbitration clause contains an exception, which provides that that "nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court." Pagnillo Dec., Ex. D at 50. Uptown's re-

quests for injunctive relief do not fall within this exception to arbitration, because the injunctive relief that Uptown seeks is not meant to address any breaches of the Provider Agreement.

UCL. This action is stayed pending the completion of arbitration.

**IT IS SO ORDERED.**