HOPKINTON DRUG, INC., Plaintiff,

v.

CAREMARKPCS, L.L.C. CVS Caremark, Corp., Defendants.

Civil Action No. 14–12794–WGY.

United States District Court, D. Massachusetts.

Signed Jan. 5, 2015.

Lawrence G. Green, Burns & Levinson LLP, Boston, MA, Christopher L. Ayers, Burns & Levinson LLP, Providence, RI, for Plaintiff.

Robert H. Griffith, Foley & Lardner LLP, Chicago, IL, Lawrence M. Kraus, Foley & Lardner LLP, Boston, MA, for Defendants.

## ·MEMORANDUM

YOUNG, District Judge.

## I. INTRODUCTION

In this emergency action, CaremarkPCS, L.L.C. and CVS Caremark Corporation (collectively, "Defendants" or "CVS Caremark"), moved to compel the plaintiff, Hopkinton Drug, Inc. ("Hopkinton") to submit to arbitration most of the claims asserted in its complaint, and to stay any remaining claims. Hopkinton, in reply, argued that the arbitration agreement is invalid and, even if it is valid, does not cover the actions at issue in this lawsuit.

The relationship between the parties is governed by a broad arbitration clause which compels arbitration. This Court does, however, retain the authority to issue a preliminary injunction and may develop the factual record necessary to do so. Before doing so, however, it needed to assure itself that the conduct Hopkinton originally sought to enjoin has not yet occurred; if it has, a preliminary injunction would be moot and could not be issued.

### A. Procedural History

On June 30, 2014, Hopkinton filed a five-count complaint against the Defendants, in which it sought injunctive and monetary relief. Verified Compl. & Jury Demand, ECF No. 8. On that same day, it also filed an emergency motion for a temporary restraining order ("TRO"). Emergency Mot. TRO, ECF No. 3. This Court held a hearing two days later, on July 2, 2014, at which time, as is its wont, it combined the TRO motion with a trial on the merits pursuant to Federal Rule of Civil Proce-

dure 65(b), and placed the case on the running trial list for September 2014. The next day, on July 3, Hopkinton filed an amended complaint, which added an additional count seeking confirmation of a previously issued arbitration award entered in its favor and against the Defendants. Verified Am. Compl. & Jury Demand ("Compl."), ECF No. 12.

That same day, the Defendants filed a motion to compel arbitration, along with an accompanying memorandum. Defs.' Mot. Compel Arbitration, ECF No. 13; Mem. Law Supp. Defs.' Mot. Compel Arbitration ("Defs.Mem."), ECF No. 14. Hopkinton responded on July 10, 2014. Pl.'s Mem. Law Opp'n Defs.' Mot. Compel Arbitration ("Pl.'s Opp'n"), ECF No. 16. The Defendants replied on July 14, 2014. Reply Supp. Defs.' Mot. Compel, Arbitration ("Defs.' Reply"), ECF No. 23.

The Court heard the matter on an expedited basis on July 17 and 18, 2014. Elec. Notice, July 14, 2014, ECF No. 21.

**B. Concerning Arbitration** [1]

Hopkinton is an independent pharmacy, which specializes in compounded pharmaceuticals (i.e., "preparing on a prescription-by-perception basis compounded medications for patients who cannot take standard prescriptions."). Compl. ¶¶ 7–8. CVS Caremark is a national pharmacy operator. Caremark entered into a provider agreement (the "Provider Agreement") with Hopkinton whereby Hopkinton agreed to fill prescriptions for health care plan members for which CVS served as a pharmacy benefits manager ("PBM").[2] *Id.* ¶ 13. On June 23, 2014, CVS Caremark issued a written notice to Hopkinton, alleging that Hopkinton was not in compliance with the Provider Agreement, and that it would terminate Hopkinton's rights under the agreement. *Id.* ¶¶ 16, 19.

The relationship between Hopkinton and CVS is governed, as discussed above, by the Provider Agreement, which incorporates by reference a provider manual (the "Provider Manual"). The Provider Manual sets out further details governing the contractual obligations among the parties. *See* Defs.' Mem., Ex. 6, Decl. Wendy Walker, Ex. C, Provider Agreement, ECF No. 14–6. The parties first entered into the Provider Agreement in 1995, and it governs the contractual relationship today. *See* Defs.' Mem., Ex. 6, Decl. Wendy Walker 2. The Provider Agreement includes a clause requiring all disputes to be settled by an arbitrator, Provider Agreement § 9.5, as well as a provision allowing Caremark to amend the agreement or manual "by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective." *Id.* § 1.3. By agreement, Arizona law applies to any substantive disputes. *Id.* § 9.4.

The Provider Manual also includes an arbitration clause. Complicating the dispute, there are two Manuals at issue here: one issued in 2011 (the "2011 Manual"),

1. Where undisputed, the following conclusions are drawn from Hopkinton's Amended Complaint, supplemented where appropriate by documents that are attached to the motion to compel arbitration and are central to the parties' claims. *See, e.g., Gove v. Career Sys. Dev. Corp.,* 689 F.3d 1, 2 (1st Cir.2012) (considering documents attached to motion to compel arbitration); *cf. also, e.g., Graf v. Hospitality Mut. Ins. Co.,* 754 F.3d 74, 75–76 (1st Cir.2014) (noting that a court may consider

necessary documents attached to a motion to dismiss). The Court resolved the disputed facts after a two-day evidentiary hearing culminating on July 18, 2014.

2. "PBMs process and pay pharmacies, such as the Plaintiffs, for filling prescriptions for patients and consumers insured under health-insurance plans that the PBMs manage." *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.,* 748 F.3d 249, 254 n. 1 (5th Cir.2014).

and one issued in 2014 (the "2014 Manual").

As is relevant for arbitration purposes, the 2011 Agreement provides that:

> Any and all disputes in connection with or arising out of the Provider Agreement by the parties will be exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the American Arbitration Association. The arbitrator must follow the rule of Law, and may only award remedies provided for in the Provider Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona, and Provider agrees to such a jurisdiction, unless otherwise agreed to by the parties in writing. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator is rendered. Except as may be required by Law, neither a party nor an arbitrator may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. Arbitration shall be the exclusive and final remedy for any dispute between the parties in connection with or arising out of the Provider agreement; provided, however, that nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court of law.

Pls.' Opp'n, Ex. 1, 2011 Provider Manual, ECF No. 16–1. The manual further provides that the contract is not static, but rather:

> From time to time … Caremark may amend the Provider Agreement … by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

*Id.* Pursuant to that authority, on November 15, 2013, CVS sent Hopkinton a cover letter accompanied by a new Provider Manual which "supersedes all previous versions of the Provider Manual" as of January 1, 2014. Defs.' Mem., Ex. 6, Decl. Wendy Walker, Ex. A, Caremark Letter, ECF No. 14–6. Wendy Walker, CaremarkPCS's Director of Contracting Communications, averred that Hopkinton Drug submitted claims after January 1, 2014, the effective date of the 2014 Provider Manual. Defs.' Mem., Ex. 6, Decl. Wendy Walker 3.

In turn, the 2014 Manual provides that:

> Any and all disputes between Provider and Caremark (including Caremark's employees, parents, subsidiaries, affiliates, agents and assigns) (collectively referred to in this Arbitration section as "Caremark"), including but not limited to disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. Unless otherwise agreed to in writing by the parties, the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures (available from the AAA). In no event may the arbitrator(s) award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or busi-

ness, except as required by law. The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to any claim that all or part of the agreement to arbitrate is void or voidable for any reason. The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator(s) is rendered, except as otherwise required by Law.

*Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.*

*No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings. Provider and Caremark agree that each*

*may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.*

Except as required by Law, neither a party nor an arbitrator may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. *The above notwithstanding, nothing in this provision shall prevent either party from seeking preliminary injunctive relief to halt or prevent a breach of this Provider Agreement in any state or federal court of law.*

Defs.' Mem., Ex. 6, Decl. Wendy Walker, Ex. A, 2014 Caremark Provider Manual at 45–46, ECF No. 14–6 (emphasis supplied).

## II. ANALYSIS

### A. Arbitration?

This Court must address four distinct issues concerning arbitration: (1) which arbitration agreement applies to this case, the 2011 or 2014 Manual, (2) if the 2014 Manual applies, is it enforceable, or is it unconscionable, (3) if the 2014 Manual is enforceable, are questions regarding the scope of arbitrability to be made by the arbiter or this Court, and (4) if this Court does have a role to play in this agreement, is it limited to issuing a preliminary injunction?

### 1. Federal Arbitration Act Context

 This case implicates the Federal Arbitration Act ("FAA"), the "overarching purpose" of which is to "ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 1748, 179 L.Ed.2d 742 (2011). The FAA "embodies the national policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038

(2006). Accordingly, in determining the scope of arbitration clauses, courts must consider general contract principles to determine the intent of the parties which underlie those clauses, but "'ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'" *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 376 (1st Cir.2011) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)). In making this determination, the Court must first determine, as a threshold matter, that the arbitration agreement is valid, legally enforceable, and encompasses the dispute in question. *Id.*

### 2. Which Arbitration Agreement Governs?

Both parties appear to agree that either the 2011 or 2014 Provider Manual sets out the arbitration clause that governs this action. *Compare* Pl.'s Opp'n 6 (2011 Provider Manual applies), *with* Defs.' Mem. 2 (2014 Provider Manual applies). They disagree, though, as to which one applies.

Hopkinton argues that the 2011 Manual ought apply because the Defendants are estopped from relying on the 2014 Manual. Hopkinton points to the fact that "[d]uring [earlier] arbitration proceedings between CVS Caremark and Hopkinton Drug, CVS Caremark took the position that the 2011 Provider Manual was the operative document." Pl.'s Opp'n 6. Thus, Hopkinton argues, the Defendants waived the right to rely on the 2014 agreement in this action. *Id.* at 7 (citing *American Cont'l Life Ins. Co. v. Ranier Const. Co., Inc.*, 125 Ariz. 53, 55, 607 P.2d 372 (1980)

("Waiver is either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such intentional relinquishment.")). The Defendants, in turn, posit that the original proceeding upon which Hopkinton relies for its waiver argument was filed in October 2013, and at issue in that proceeding was a CVS audit which occurred in April 2013. Defs.' Reply 2. Such conduct, they argue, occurred while the 2011 agreement governed. The current suit, however, concerns a complaint filed on June 30, 2014, and at issue here is a 2014 decision by CVS to terminate its contractual relationship with Hopkinton. *Id.* Accordingly, they say, because the 2011 Manual governed conduct that happened before 2014, and the 2014 Manual governed conduct that occurred in 2014, there is no conflict, and thus no waiver or estoppel.

The Defendants have the better of this argument. First, they are correct that the original arbitration (which both parties agree was governed by the 2011 Manual) covered conduct that occurred in April 2013. *See* Pl.'s Opp'n, Ex. 3, CaremarkPCS, L.L.C.'s Mot. Dismiss Demand Arbitration 4, ECF No. 16–3. In the current suit, however, the gravamen of Hopkinton's complaint is that the Defendants have breached their contractual and other obligations by virtue of their decision to "issue[ ] the Notice to Hopkinton Drug without proper cause."[3] Compl. ¶ 26. That notice occurred in June 2014, when the 2014 Manual was in effect. Thus, it is consistent for the Defendants to argue that one agreement governs one set of conduct, and another agreement governs another set of conduct, even if those dis-

---

3. Count I (breach of contract), Count II (breach of covenant of good faith and fair dealing), and Count III (breach of Any Willing Provider Act) are all based on the Defendants' decision to terminate the Agreement. Count IV (unlawful civil conspiracy) does not have a clear date of injury, and Count V (unfair and deceptive practices under Chapter 93A) is a derivative claim of the first four counts. Count VI, requesting arbitration confirmation, is an essentially independent action.

putes are between the same parties. As "[w]aiver by conduct must be established by evidence of acts inconsistent with an intent to assert the right," *American Cont. Life Ins. Co.*, 125 Ariz. at 55, 607 P.2d 372, and as there is no such inconsistency here, the Court rejects Hopkinton's waiver argument.[4]

This ruling, however, does not necessarily resolve the question. There is an argument—which the parties have not briefed and therefore may have waived—that Caremark did not properly amend the 2011 Manual. Under the terms of the Provider Agreement, Caremark may amend the agreement or manual "by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective." Provider Agreement § 1.3. The 2011 Manual has similar language. 2011 Manual ("Caremark may amend the Provider Agreement ... by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective.").

Caremark provided Hopkinton 45 days' notice of the substitution of the 2014 Provider Manual, which satisfies the 30-day notice requirement set out in the Provider Agreement. *See* Provider Agreement § 1.3; Caremark Letter. It is not entirely clear, however, whether it gave "notice to the Provider of the terms of the Amendment." In its November letter, Caremark stated that:

> The Provider Manual is part of your Provider Agreement with CVS Caremark and this 2014 version supersedes all previous versions of the Provider Manual.

The question, which neither party raises in their briefs, is whether stating that the updated version "supersedes all previous versions" of the manual counts as giving notice of the terms of the amendment. By one reading, it does not, as "notice of the terms of the Amendment" would imply mentioning the *specific* terms that change between versions of the manual. By another reading, however, it would—"provide notice of the terms of the Amendment" could be read simply as "what changed?" and here, Caremark is essentially saying "the entire Manual has changed," or, said a different way, the terms of the Amendment are that the Manual is superseded-in-full.

Further complicating matters is the fact that, apparently, the Provider Agreement is updated relatively often (or at least changed several times in the first half of this decade). In the context of such repeated contractual processes, information on the course of performance and subsequent conduct of the parties is particularly useful. *See, e.g., Darner Motor Sales, Inc. v. Univ. Underwriters Ins. Co.*, 140 Ariz. 383, 393, 682 P.2d 388 (1984); *Evers v. Safety–Kleen Sys., Inc.*, No. CV 10–02556–PHX–NVM, 2012 WL 2871113, at *2 (D.Ariz. July 12, 2012). If the type of notice that CVS provided in its November 2013 letter was accepted, repeatedly, without objection, that would be evidence that the notice was sufficiently detailed to satisfy the Performance Agreement. If, however, the November 2013 letter was an aberration, it would be evidence that such

---

4. While Hopkinton uses the language "estoppel" in its header, it primarily relies on cases that discuss waiver. Pls.' Opp'n 6–7. In any event, an argument based on estoppel fares no better. Under Arizona law, "[e]quitable estoppel applies where the party to be estopped engages in acts inconsistent with a position it later adopts and the other party justifiably relies on those acts, resulting in injury." *Verma v. Stuhr*, 223 Ariz. 144, 155, 221 P.3d 23 (Ariz.Ct.App.2009). As discussed above, in this case, the Defendants have not taken any inconsistent action, nor is there any evidence of reliance.

notice would be insufficient. In that case, the operative agreement would be the most-recent agreement, which could be the 2011 Manual (had it been noticed properly) or even the original Performance Agreement.

The parties do not brief this issue, and thus this Court may properly consider it waived. *See, e.g., Zogenix, Inc. v. Patrick,* No. 14–11689, 2014 WL 3339610, at *5 n. 4 (D.Mass. July 8, 2014) (Zobel, J.) (unbriefed arguments are waived). Moreover, if the 2014 Manual does not apply (because of a notice failure) it is unclear what agreement *does* control, and the Court likely cannot answer that question without further information from the parties.

Accordingly, based on the issues the parties have highlighted in their briefing, and the conclusions drawn therefrom, this memorandum proceeds under the assumption that the 2014 Manual applies.

### 3. Unconscionability

Hopkinton argues that even if the 2014 Manual applies, the arbitration clause itself ought be severed as unconscionable, because it is a contract of adhesion that is unduly oppressive. Pl.'s Opp'n 7–9.

 Arizona law distinguishes between two types of contractual unconscionability—" 'procedural unconscionability, i.e., something wrong in the bargaining process, and substantive unconscionability, i.e., the contract terms per se.' " *Nelson v. Rice,* 198 Ariz. 563, 567, 12 P.3d 238 (Ariz. Ct.App.2000) (quoting *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken,* 179 Ariz. 289, 293, 877 P.2d 1345 (Ariz.Ct.App. 1994)). Contractual unconscionability is determined by the court as matter of law. *Maxwell v. Fidelity Fin. Servs., Inc.,* 184 Ariz. 82, 87, 907 P.2d 51 (1995) (en banc). Moreover, at least for the sale of goods under the Uniform Commercial Code (and thus presumptively for all contracts, barring case law to the contrary), a showing of substantive unconscionability alone is

sufficient for an unconscionability holding. *See id.* at 90, 907 P.2d 51.

### a. Procedural Unconscionability

 Procedural unconscionability "is concerned with 'unfair surprise, fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should.' " *Id.* at 88–89, 907 P.2d 51 (quoting Dan B. Dobbs, 2 *Law of Remedies* 706 (2d ed.1993)). Courts consider such factors as " 'the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.' " *Id.* at 89, 907 P.2d 51 (quoting *Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264, 268 (E.D.Mich.1976)). Hopkinton's primary argument is that the arbitration clause is unconscionable because CVS Caremark presented it to Hopkinton on an improper "take-it-or-leave-it basis." Pl.'s Opp'n 10.

 Under Arizona law, not all "take it or leave it" contracts are unconscionable, even if they are adhesive. *Broemmer v. Abortion Servs. of Phoenix, Ltd.,* 173 Ariz. 148, 150–51, 840 P.2d 1013 (1992) (en banc). The situations where such contracts are found to be procedurally unconscionable are generally those where there are significant gaps in age, education, or income (such as in consumer contracts). Mere differences in bargaining power, even if significant, generally are not enough. *E.g., Cooper v. QC Fin. Servs., Inc.,* 503 F.Supp.2d. 1266, 1278 (D.Ariz.2007); *see also Equal Employment Opportunity Comm'n v. Cheesecake Factory, Inc.,* No. 08–cv–1207, 2009 WL

1259359, at *3 (D.Arizona May 6, 2009) ("Mere inequality in bargaining power is not sufficient to invalidate an arbitration agreement."). Accordingly, courts have generally been reluctant to find contracts between merchants to be unconscionable. *See Captain Bounce, Inc. v. Bus. Fin. Servs., Inc.,* No. 11–CV–858 JLS (WMC), 2012 WL 928412, at *7 (S.D.Cal. Mar. 19, 2012). As such, plaintiffs seeking a procedural unconscionability severance must make (not merely allege) "a showing of the lack of meaningful choice." *Coup v. Scottsdale Plaza Resort, LLC,* 823 F.Supp.2d 931, 949 (D.Ariz.2011).

■ Here, Hopkinton alleges that "[e]very retail pharmacy must do business with CVS Caremark, since it is the largest provider of prescription and related health services in the country. There is no meaningful choice." Pl.'s Opp'n 10. It offered no evidence of such a claim, however, as it was required to do. Moreover, even if CVS is, indeed, the largest pharmacy provider, that claim does not necessitate a conclusion that there is no meaningful choice. *See, e.g., Captain Bounce,* 2012 WL 928412, at *7 (holding that there are meaningful choices so long as there "exist[s] ... reasonable market alternatives"). As such, this Court concludes that there is an insufficient showing of procedural unconscionability.

Such a conclusion accords with how other courts, applying Arizona law to the Caremark contract (albeit the 2011 version) have ruled. In *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.,* 748 F.3d 249 (5th Cir.2014), the Fifth Circuit rejected a procedural unconscionability claim on the grounds that there was no evidence that the plaintiffs could not have abstained from contracting with CVS (and in that case, there were affidavits stating that Caremark is the largest PBM in Mississippi, evidence lacking in the instant case), and that the adhesion term was

sufficiently conspicuous in the agreement. *Id.* at 264–66. Such grounds apply equally here. Similarly, in *Uptown Drug Co., Inc. v. CVS Caremark Corp.,* 962 F.Supp.2d 1172 (N.D.Cal.2013), the court similarly rejected a procedural unconscionability argument on three grounds: First, that the plaintiff's allegations of a lack of bargaining choice were "conclusory and unsupported by the evidence." *Id.* at 1181. Second, that the arbitration clause was sufficiently visible in the manual. *Id.* at 1182. Third, the court concluded that in the case of agreements between two business entities, the plaintiff must provide evidence to show that it "was in any way unsophisticated" and that Caremark "had overwhelming relative bargaining power." *Id.* The reasoning of these courts, which address the same legal issues and the same facts as at issue here, are persuasive, and counsel in favor of a ruling that there is no procedural unconscionability in the contract at bar.

### b. Substantive Unconscionability

■ A contract may also be substantively unconscionable. In making that determination, the Court must look to the "actual terms of the contract and examine[ ] the relative fairness of the obligations assumed." *Maxwell,* 184 Ariz. at 89, 907 P.2d 51. Relevant factors include: "contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id.* The plaintiff has the obligation of creating an evidentiary record to demonstrate that enforcement of a contract would be unconscionable. *Harrington v. Pulte Home Corp.,* 211 Ariz. 241, 253, 119 P.3d 1044 (Ariz.Ct.App.2005).

■ Hopkinton premises its substantive unconscionability claim on three bases: first, that the arbitration clause limits

Caremark's liability to actual damages, rather than punitive or indirect damages, lost profits, or reputational injury; second, that the agreement eliminated class actions as a permissible procedural vehicle, and third, that limiting judicial injunctive relief only to preliminary injunctions is unfair. Pl.'s Opp'n 12.

Turning first to remedies, Hopkinton correctly cites cases holding that arbitration clauses that limit recovery to actual damages can be substantively unconscionable. *See id.* at 13 (citing, e.g., *Whitney v. Alltel Comm'ns, Inc.,* 173 S.W.3d 300, 310 (Mo.Ct.App.2005)); *Bellsouth Mobility LLC v. Christopher,* 819 So.2d 171, 173 (Fla. 4th DCA 2002). The Defendants, in turn, rely on *PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003) for the proposition that arbitration clauses that limit available remedies are acceptable. Defs.' Reply 6. In that case, the plaintiffs, who were subject to an arbitration agreement banning punitive damages, brought a civil RICO case and sought treble damages, as was permitted under the statute. *PacifiCare Health Sys.,* 538 U.S. at 402–03, 123 S.Ct. 1531. The Supreme Court, recognizing that treble damages could be considered compensatory (and thus allowed under the arbitration agreement) or punitive (and thus forbidden), refused to rule on whether treble damages under the RICO statute were compensatory or punitive. Rather, the Supreme Court remanded the case back to the lower courts to determine whether such damages were "punitive" within the meaning of the arbitration agreement. *Id.* at 406–07, 123 S.Ct. 1531. The First Circuit, addressing similar Chapter 93A claims, also remanded a case to the arbiter to make factual findings necessary to determine whether treble damages and punitive damages were in actual conflict. *See, e.g., Anderson v. Comcast Corp.,* 500 F.3d 66, 74–75 (1st Cir.2007).

These cases do not, as the Defendants would argue, stand for the broad proposition that any arbitration agreement limiting damages is proper. Rather, they stand for the narrower proposition that courts ought try to read arbitration agreements and underlying statutory rules in harmony to the extent possible. Moreover, turning back to the agreement here, the 2014 Manual provides that the arbiter may not "award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, *except as required by law.*" 2014 Manual at 45 (emphasis added). Such language would support a conclusion that broader damages *would* be allowed if required under the relevant statutory provisions, and thus, like in *PacifiCare,* this Court ought hold in reserve a finding about whether the arbitration clause and statutory context can be read together in this specific case. Accordingly, this Court does not rule that the arbitration provision is substantively unconscionable on this ground.

Second, Hopkinton challenges the arbitration agreement's limitation of class action remedies. *See* Pl.'s Opp'n 13. This argument, however, runs aground in the face of two recent Supreme Court cases, *American Express Co. v. Italian Colors Rest.,* —— U.S. ——, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013), and *AT & T Mobility LLC v. Concepcion,* 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). In *Concepcion,* the Court held that the Federal Arbitration Act overruled state laws that sought to mandate class action procedures in consumer arbitration cases. 131 S.Ct. at 1750–51 ("[C]lass arbitration, to the extent it is manufactured by [state law] rather than consensual, is inconsistent with the FAA"). In *American Express,* the Supreme Court emphasized that, absent a

clear federal statutory command to the contrary, class action waivers are valid. 133 S.Ct. at 2309.[5] These cases thus can be read for the proposition that a class action waiver is not so objectionable as to make its existence unconscionable.

Finally, Hopkinton attacks the arbitration clause's limitation of injunction relief only to preliminary injunctions. Pl.'s Opp'n 11. Here, though, given that arbitration clauses may forbid judicial involvement entirely without creating unconscionability problems, it does not seem unreasonable to say that a clause may limit (though not eliminate) such judicial involvement, and Hopkinton points to no case law to the contrary. *Cf., e.g., Taylor v. Betts*, 59 Ariz. 172, 178, 124 P.2d 764 (1942) (recognizing the principle of "the greater includes the lesser").

Accordingly, given the evidentiary record, this Court holds that the 2014 arbitration clause is not substantively unconscionable.

### 4. Determining Questions of Arbitrability

Assuming, as this memorandum has done, that this agreement is subject to arbitration, the question then becomes who—the court or the arbiter—may determine which subjects are within the scope of the arbitration agreement.

The Supreme Court, in *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), set out a general rule that "the question of arbitrability ... is undeniably an issue for judicial determination." *Id.* at 649, 106 S.Ct. 1415. In its next breath, though, it created an exception: *"Unless the parties clearly and unmistakably provide otherwise,* the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* (emphasis added). In *Awuah v. Coverall North Am., Inc.*, 554 F.3d 7 (1st Cir.2009), the First Circuit unpacked this phrase in a situation where, as here, the arbitration agreement incorporated the Rules of the American Arbitration Association ("AAA"). *Id.* at 11. There, the court held that the presence of AAA Rule 7(a), which "says plainly that the arbiter may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope, or validity of the arbitration agreement,' .... is about as 'clear and unmistakable' as language can get." *Id.* at 11.

In this case, the 2014 Manual dictates that the parties must follow the AAA's Commercial Arbitration Rules and Mediation Procedures, but the operative rule is the same in that context. *See Commercial Arbitration Rules and Mediation Procedures,* https://www.adr.org/aaa/Show

---

**5.** "To a hammer, everything looks like a nail. And to a Court bent on diminishing the usefulness of Rule 23, everything looks like a class action, ready to be dismantled." Kagan, J. dissenting in *American Express*, 133 S.Ct. at 2320. "On [this] very important issue ... the Roberts Court has been unremittingly conservative: access to judicial remedies for legal wrongs. At every stage, it has favored rules that make it more difficult to pursue justice in the courts.... It has upheld contract provisions that require consumers and employees to pursue remedies against corporations through arbitration favored by employers rather than in court. It has presumptively barred classwide arbitration, even where that means that some forms of illegal conduct will never be remedied. This is the case, for example, when a corporation has fraudulently bilked thousands of consumers out of amounts of money too small to warrant individual litigation, while its standard contracts require that all disputes be arbitrated on a one-by-one basis." David Cole, The Anti–Court Court, New York Review of Books, Aug 14, 2014. See Andrew Siegel, The Court against the Courts: Hostility to Litigation as an Organizing Theme in the Rehnquist Court's Jurisprudence. 84 Tex. L.Rev. 1097 (2006)(demonstrating the disdain shown by the Supreme Court for the lower courts).

Property?nodeId=/UCM/ADRSTG_ 004103. Such precedent, which has been echoed by other courts, suggests that the arbitrator determines the scope of arbitrability. *See also, e.g., Crawford,* 748 F.3d at 262–63 (concluding that a reference to the AAA Rules in the Caremark Provider Agreement was "clear and unmistakable evidence" that the parties "agreed to arbitrate arbitrability").

In response, Hopkinton relies on the Sixth Circuit case *Turi v. Main Street Adoption Servs., LLP,* 633 F.3d 496 (6th Cir.2011). *See* Pl.'s Opp'n 18. There, faced with a narrow arbitration clause governing certain fees, the Sixth Circuit held that despite the incorporation of the AAA Rules which "generally delegate [the] power [to determine jurisdiction] to the arbitrator," the arbitrator could not "decide the arbitrability of ... claims that are clearly outside the scope of the arbitration clause." *Turi,* 633 F.3d at 506–07. The court held that because the arbitration clause was "narrow," it was "more likely that the provision [did] not even 'arguably' apply to the dispute at issue." *Id.* at 507. Similarly, in *Jackson & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76 (Del.2006), also cited by Hopkinton, the Delaware Supreme Court "adopt[ed] the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator." *Id.* at 80. It interpreted this rule, however, as applying only "in those cases where the arbitration clause generally provides for arbitration of all disputes and

also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.* Other courts have persuasively questioned the reasoning of both of these decisions. *See, e.g., Oracle Am., Inc. v. Myriad Grp. A.G.,* 724 F.3d 1069, 1076–77 (9th Cir.2013).

 In any event, even if these rules govern here, they do not dictate a different result. Turning first to *Turi,* there, the Sixth Circuit premised its argument on the assumption that the arbitration clause was so narrow that the provision did not "arguably" apply to the dispute. In this case, the 2014 agreement covers "[a]ny and all disputes between Provider and Caremark," and thus arguably would cover all disputes. 2014 Manual at 50. Turning next to *James & Jackson,* there, the key question was whether the clause "incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." 906 A.2d at 80. In that case, the court cited as sufficient a decision interpreting an arbitration clause which covered "all matters in dispute between [the parties]." *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1329 n. 1 (11th Cir.2005). Such a clause is essentially the same one as in the case at bar.

Accordingly, this Court rules the arbitrator has the authority to determine the arbitrability of the claims raised in the complaint.

### 5. Judicial Involvement

Finally, the Court addresses the key issue: does this Court have the authority to do anything other than issue a preliminary injunction?[6] It does not. As a

---

**6.** It may seem incongruous for this Court to consider this question, having just ruled that the arbiter has the right to determine arbitrability. Such apparent conflict can be resolved, however, by recognizing that the above arbitrability analysis concerns which aspects of the *substantive relationship* between the parties are to be determined by the arbiter, while this question discusses what, if any, *procedural* role the Court plays in overseeing the arbitration process. The FAA itself provides an analogy—there, the Court maintains a procedural role in compelling arbitration, even though it may have no substantive power to resolve disputes. *See* 9 U.S.C. § 4. Here, by analogy, the arbitration agreement reserves a preliminary injunction role to the Court, even though it strips it of its power to resolve any contested substantive issues.

starting premise, arbitration clauses are interpreted pursuant to normal contract interpretation standards and ambiguities in the scope of the language are to be resolved in favor of arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.,* 748 F.3d 1, 7 (1st Cir.2014); *see also Paul Revere Variable Annuity Ins. Co. v. Kirschhofer,* 226 F.3d 15, 25 (1st Cir.2000) (discussing presumption in favor of arbitrability).

Hopkinton, relying mainly on the 2011 Manual, argues that the arbitration clause specifically reserves for parties the right to seek injunctive relief in state or federal court. Pl.'s Opp'n 15. It does. But that is of no moment: as discussed earlier, the 2014 Manual, not the 2011 Manual, controls. Turning to the clause in the 2014 Manual, the clause reserves the right of either party to "seek[ ] preliminary injunctive relief to halt or prevent a breach of this Provider Agreement in any state or federal court of law." 2014 Manual at 46. In the same breath, though, the clause provides (in bolded language) that:

> In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All

of these rights are waived and disputes must be resolved through arbitration. *Id.* at 45.

█ Under governing Arizona law, "each part of a contract must be read together, 'to bring harmony, if possible, between all parts of the writing.'" *ELM Ret. Ctr., LP v. Callaway,* 226 Ariz. 287, 291, 246 P.3d 938 (Ariz.Ct.App.2010) (quoting *Gesina v. Gen. Elec. Co.,* 162 Ariz. 39, 45, 780 P.2d 1380 (Ariz.Ct.App.1988)). Reading these two provisions together, then, the best reading is that a party can seek judicial action to *pause* the breach of the Agreement, but cannot seek the courts involvement *substantively to resolve* the dispute, otherwise the provision that states that neither party has "the right to litigate that dispute through a court" would be rendered meaningless. Given that courts generally "lack[ ] authority to act in the face of a valid arbitration agreement," *Di-Mercurio v. Sphere Drake Ins., PLC,* 202 F.3d 71, 78 (1st Cir.2000), the language in the Provider Agreement implies that this Court may: (1) issue a preliminary injunction, and accordingly take evidence and hold proceedings necessary to determine whether to so issue, but (2) may not combine an injunction proceeding with a trial on the merits, and may not issue a final ruling on the merits. This the Court proceeded to do.[7]

---

Alternatively, this clause in the arbitration agreement may be conceived of as a clear (if very specific) exception to the broad grant of power to the arbiter to determine arbitrability.

**7.** There was some question at the time of the hearing whether claims for preliminary injunctive relief might still lie, or whether, if the contract has already been voided, they are moot. *See Davidson v. Howe,* 749 F.3d 21, 25–26 (1st Cir.2014) (appeal of denial of preliminary injunction is moot if event to be enjoined has occurred); *Bader v. Goldman Sachs Grp:, Inc.,* 311 Fed.Appx. 431, 432 (2d Cir.2009) (same); *Chapman v. S. Buffalo Ry.*

*Co.,* 43 F.Supp.2d. 312, 318 (W.D.N.Y.1999) ("An issue is mooted [and thus a preliminary injunction cannot issue] where the activities the plaintiff seeks to enjoin have already occurred ...."); *see also* Black's Law Dictionary 904 (10th ed.2014) (defining preliminary injunction as "[a] temporary injunction issued before or during trial to prevent an irreparable injury from occurring before the court has a chance to hear the case"). The Court concludes that whether or not the contract has been breached (a question for the arbiter), maintenance of the previous status quo remains within the equitable jurisdiction of this Court.

## B. Determining the Preliminary Injunction

On July 18, 2014, the Court granted Hopkinton a preliminary injunction ore tenus, fully explaining its reasoning from the bench. The key findings and rulings were set forth as follows:

The Court, now having held a two-day evidentiary hearing, makes the following ultimate findings on the motion of Hopkinton Drug, Incorporated for a preliminary injunction.

The Court finds that Hopkinton Drug has demonstrated that, in the absence of preliminary relief, it is and will in the future continue to suffer irreparable harm as the legal framework construes it. The loss of its pharmaceutical customers is in large measure, this Court infers, irreparable. The fact that that loss may largely be quantified does not entirely satisfy the damage to Hopkinton's goodwill because there are collateral benefits to any drugstore from its customer base, a customer base that this Court finds is presently being removed at least in the range of one-quarter to one-third.

The balance—putting aside the reasonable likelihood of success, the balance of harm also favors Hopkinton because Caremark is in the business of managing these pharmaceutical benefits and has the capacity both to accept such a pharmacy and to terminate such a pharmacy, whereas with Hopkinton it's a one-way street, unless it is a member of the Caremark network it can't—it has no other means of obtaining access to the needs of customers located within its geographic base who have health care plans that have contracted with Caremark.

Third, the Court readily infers that the public interest favors a viable drugstore in downtown Hopkinton that is served by the largest number of pharmacy benefit managers and in turn is served or is connected with the largest number of insured employer and employee insured benefit plans. The public is the people, not these litigating corporations. The people are best served by a full-service pharmacy in that location that can handle the prescriptions of the largest number of people in that geographic area.

The Court concludes that there is no significant safety issue identified in this proceeding. The issue on which prior arbitration proceedings have turned has to do with the matter of licensure, it does not have to do with the matter of safety. And therefore there would seem to be no damage to the public health and safety from a reinstatement of Hopkinton.

Now, turning to what is the dispositive issue, the reasonable likelihood of success on the merits. Here it is clear that the significant aspects of this present termination dispute have already been determined by a prior arbitration between the parties. The Court notes, parenthetically, having read the two decisions of the arbitrator, that they are models of the judicial art, they are straightforward, they are succinct, they dispose of the matters directly before the arbitrator in a clear and persuasive manner, and the Court has little hesitancy in—on this record anyway, fully subscribing to them and giving them res judicata effect. And so the following things have been decided and are not—and will not be revisited. Hopkinton broke this contract by dispensing drugs in states where it was not licensed. On this record this court does not conclude that that was intentional in any way, but it is a violation of the terms of the agreement and it is an undoubted violation. Caremark properly and in accordance with its contract then sequestered

funds from Hopkinton. The result was that once they found out about it—once it found out about it, Hopkinton sought arbitration. Arbitration then ensued. The result of the arbitration was a finding of breach by Hopkinton, but a finding of breach in the amount of the sequestration on the part of Caremark.

The document speaks for itself. I won't characterize it. The amount of over sequestration was modest, but not de minimis, and that sum was awarded to Hopkinton. And then, in accordance with the rules of the American Arbitration Association, Hopkinton, as the prevailing party on that issue, was awarded its attorneys fees and costs and the sum total amounts to about $100,000.

Against this record in this proceeding on the reasonable likelihood of success, Hopkinton advances two arguments. It says that the matter of termination, which could have but was not raised in the arbitration proceeding, has in effect been concluded by the arbitration proceeding and Caremark cannot now terminate it on the ground of the proper, at least to some extent, sequestration that was adjudicated in the arbitration proceeding because the arbitration proceeding took care of all issues having to do with that audit.

In order for that argument to have any merit, this Court must import to the arbitration proceeding by analogy the—what are the compulsory counterclaim requirements of most court rules of civil procedure. The Court does so on the basis of the brief filed by Hopkinton.

The Court—there is a need here for immediate action and based upon the case law, which has been presented to the Court, I conclude that, by analogy, the rules of res judicata apply here as to claims which could have been but were not brought in the arbitration, which claims are so significantly related to the dispute at hand that any reasonable person would have understood that they could have been brought, and have allowed the arbitrator to resolve them. That's the major ground of decision. And if these cases don't say what Hopkinton claims they say, it is fully open to the Court to reconsider it.

A secondary ground of decision is that the Court finds a reasonable likelihood of success on the issue of a violation of the covenant of good faith and fair dealing. There are a variety of grounds that the Court reaches this conclusion, but it is based upon the totality of the record. The passage of time from the events uncovered in the audit, the Court finds that those problems were corrected by Hopkinton with reasonable promptitude. The language of the termination, which depends upon those events, though the termination is sometime long after, they were corrected. The immediacy of the $100,000 award to Hopkinton, not yet paid by Caremark, and the concern that the Court has, and I think it is a reasonable and fair inference, that these contractual agreements may be—and there is evidence in the record that they are, being used to exercise economic power rather than just the rights under the contract.

For all these reasons the Court preliminarily and mandatorily orders CVS Caremark Corporation, its agents, officers, subsidiaries, its parent, all persons acting—its attorneys, all persons acting in concert with them, that they as—immediately, one, revoke the notice of termination dated June 23rd, 2014, that they immediately reinstate Hopkinton Drug, Incorporated as a provider with the full rights and benefits under the provider agreement appertaining thereto. And this order of the Court will remain in effect until further order of the Court, either upon reconsideration or upon the arbitration award seeking to

be confirmed by either party which may well indicate that the preliminary and mandatory injunction just entered is improvident.

This award—this preliminary injunction requires a bond. A sufficient bond is the $100,000 payment under the arbitration award. Caremark need not pay over those sums until the Court—until it is decided either by—until it—were it decided by a higher court that this injunction was improvidently granted and then that $100,000 will suffice to recompense, upon adequate proof, Caremark for any damages it may suffer by virtue of the award.[8]

## C. What Now?

As presaged by the analysis above, once this Court had disposed of the issues relating to the preliminary injunction, it dutifully sent the parties to a second arbitration and administratively closed the court case. In retrospect, perhaps the Court was overhasty, causing the parties needless expense and delay.[9] *See Telephone Workers U. of N.J., Local 827 v. New Jersey Bell Tel. Co.,* 584 F.2d 31, 33 (3d Cir.1978) (district court should determine whether prior federal judgment decided issue on which party seeks to compel arbitration);

*Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Café,* 566 F.2d 861, 863 (2d Cir.1977) (district court should determine res judicata effect of foreign judgment on petition to compel arbitration); *National Shipping & Trading Corp. v. Buck Shipping Int'l Ltd.,* No. 81 Civ. 3818 (S.D.N.Y. Apr. 3, 1985) (LEXIS, Genfed Library, Dist file) [available on WESTLAW, 1985 WL 495] (courts appropriately consider res judicata arguments on motions to compel or stay arbitration).

In this case, the facts are not in dispute, and the law is clear. Indeed, there seems little for the arbiter to do because "[t]he doctrine of res judicata bars relitigation of a claim that has been adjudicated in a prior action involving the same parties or their privies." *Chestnut Hill Dev. Corp. v. Otis Elevator Co.,* 739 F.Supp. 692, 696 (D.Mass.1990) (Caffrey, J.) (citing *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948)). In fact, it is black letter law that a valid and final judgment in favor of a defendant bars a subsequent action by the plaintiff regarding the same claim. Where a valid and final judgment in any action "extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to reme-

**8.** One deeply troubling aspect of these proceedings is the testimony of Heidi Haffner, Senior Manager of Pharmacy Audit for CVS Caremark, a long-time attendee of meetings held by the Pharmacy Membership Review Committee, the body within CVS Caremark that evaluates alleged violations of the Provider Agreement. Ms. Haffner testified that, while this committee has at least a decade of experience evaluating such violations, no CVS pharmacy has ever been terminated, while a number of independent pharmacies have suffered the ultimate sanction of termination. July 17, 2014 Transcript 142: 5–19, 148: 15–23, ECF No. 43.

This Court expresses no opinion on the internal relationship of CVS pharmacies to the CVS Caremark pharmacy benefits manager

function. There is here, however, at least the appearance of impropriety from the apparent disparity in treatment as between independent pharmacies and CVS Caremark's own brood. Accordingly, the Court will forward a certified copy of the transcript and opinion in this case to the Federal Trade Commission and the Antitrust Division of Department of Justice for such investigation and action as either or both may deem appropriate.

**9.** It may be objected that this conclusion comes far too late. True, but as Justice Frankfurter correctly observed: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Trust Co.,* 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J. dissenting).

dies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1).

Res judicata applies with equal force to arbitration: "[A] valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court." Restatement (Second) of Judgments § 84(1) (1982); *see also In re Dunn*, No. 06–10630, 2007 WL 8027259, at *6 (D.Mass. Feb. 27, 2007) (Saris, J.) ("[T]he First Circuit has left no doubt that an arbitrator's decision may be given preclusive effect. The First Circuit has held the doctrines of collateral estoppel and res judicata apply to arbitration awards.") (internal citations and quotations omitted).[10]

The oft-cited decision in *Burmah Oil Tankers, Ltd. v. Trisun Tankers, Ltd.*, 687 F.Supp. 897 (S.D.N.Y.1988) (MacMahon, J.) is squarely on point.

It is well settled that the related doctrines of res judicata and collateral estoppel apply to arbitration proceedings. *Maidman v. O'Brien*, 473 F.Supp. 25, 29 (S.D.N.Y.1979). Res judicata bars all claims that were or could have been raised by a party to prior litigation on the same cause of action. *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); *Zoriano Sanchez v. Caribbean Carriers, Ltd.* 552 F.2d 70, 72 (2d Cir.), cert. denied, 434 U.S. 853, 98 S.Ct. 168, 54 L.Ed.2d 123 (1977); *Dalow Industries, Inc. v. Jordache Enterprises*, 631 F.Supp. 774, 778 (S.D.N.Y.1985). *Res Judicata thereby prevents splitting a cause of action, see Migra v. Warren City School Dist. Bd.*

*of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984); *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1368 (D.C.Cir.1981), and the attendant waste of judicial resources, increased burdens on litigants, and undermining of finality of judgments that follow from splitting a cause of action. *See Schmieder v. Hall*, 545 F.2d 768, 771 (2d Cir.1976), cert. denied, 430 U.S. 955, 97 S.Ct. 1601, 51 L.Ed.2d 805 (1977); *Ritchie v. Landau*, 475 F.2d 151, 156 n. 5 (2d Cir.1973). These concerns particularly apply to arbitration which is intended to promote speedy, efficient, and inexpensive resolution of disputes. *See Schattner v. Girard, Inc., supra,* 668 F.2d at [1]371; Note, The Preclusive Effect of Arbitral Determinations in Subsequent Federal Securities Litigation, 55 Fordham L.Rev. 655, 664 (1987) ("By preventing unnecessary duplicative litigation and promoting speedy yet efficient claim resolution, the doctrine of preclusion is in harmony with the Arbitration Act's goal of promoting efficient dispute resolution." (footnotes omitted)); *cf. Liberian Vertex Transports, Inc. v. Associated Bulk Carriers, Ltd.*, 738 F.2d 85, 87 (2d Cir.1984) (declining to permit interim appeal of district court refusal to confirm partial final award: "such a right would undermine the major purpose of the Federal Arbitration Act, which is 'to permit a relatively quick and inexpensive resolution of contractual disputes by avoiding the expense and delay of extended court proceedings.'") (quoting in part *Diapulse Corp. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir.1980)).

The parties do not dispute that the arbitration award was a final decision on

---

**10.** An arbitration award, however, "does not preclude relitigation of the same or a related claim based on the same transaction if a scheme of remedies permits the assertion of the second claim notwithstanding the award regarding the first claim." Restatement (Second) of Judgments ¶ 84(2). A close perusal of the Provider Agreements here suggests no such exception.

the merits and that they were both parties to it. The parties also do not dispute that Trisun's demurrage claim could have been presented to the arbitration panel but was not.

*Id.* at 899.

Applying Judge MacMahon's analysis to this case is particularly compelling: "Clearly, the facts [here] are 'related in time, space, origin, or motivation,' because they arise out of the same document [the Provider Agreement] and same transaction [the breach for non licensure] previously examined at length by the arbitrator[ ]. In contract disputes involving two claims under the same contract, the parties would be required to litigate both claims in the same cause of action." *Id.* at 900. *See also Alyeska Pipeline Serv. Co. v. United States,* 231 Ct.Cl. 540, 688 F.2d 765, 769 (1982) (single nondivisible contract normally gives rise to only one claim), cert. denied, 461 U.S. 943, 103 S.Ct. 2120, 77 L.Ed.2d 1301 (1983); *Frankel v. Standard Radio Corp.,* 50 Misc.2d 492, 270 N.Y.S.2d 667, 669 (N.Y.Civ.Ct.1966) (separate claims under same contract "must be referred to arbitration as one for complete relief in an arbitration award"); *see also Solow v. Avon Prods., Inc.,* 56 A.D.2d 785, 786, 392 N.Y.S.2d 618 (N.Y.App.Div.1977) ("Claims for damages spawned by the same liability on the same contract, and ascertainable at the time an action is commenced, must be demanded, if at all, in that action."); 4 A. Corbin, *Corbin on Contracts* 955, at 837 (1951) ("[I]t is inconvenient and vexatious to bring more than one action after all the breaches have occurred."). CVS Caremark offers no reason for a different result here. Indeed, the next arbiter will be considering the very same evidence as his predecessor. Accordingly, CVS Caremark's demand for termination should have been raised in the original arbitration proceeding and ought not now be raised separately. *Burmah Oil Tankers,* 687 F.Supp. at 901.

Despite this determination, however, "there is broad agreement among the circuit courts that the 'effect of an arbitration award on future awards ... is properly resolved through arbitration.'" *Employers Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.,* 744 F.3d 25, 27 (1st Cir.2014) (quoting *Courier–Citizen Co. v. Bos. Electrotypers Union No. 11,* 702 F.2d 273, 280 (1st Cir.1983)). Furthermore, the First Circuit has determined that the arbiter is the proper person to determine the preclusive effect of a prior arbitration. *Id.* at 28 (citing *National Cas. Co. v. OneBeacon Am. Ins. Co.,* No. 12–CV–11874, 2013 WL 3335022, at *8 (D.Mass. July 1, 2013) (Casper, J.)). Thus, this Court, at present, will stay its hand.

## III. CONCLUSION

For the foregoing reasons, the Court preliminarily enjoined CVS Caremark from terminating Hopkinton as a party to the Provider Agreement, and ordered the parties to arbitrate the merits of the dispute.